UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------x

CHARLES BRAINARD,

                Plaintiff,

    - against -

KENYON & KENYON, LLP; the KENYON & KENYON
PENSION PLAN; and GEORGE BADENOCH,
MICHAEL LOUGHNANE and ROBERT TOBIN, as
fiduciaries of the KENYON & KENYON PENSION
PLAN,

                Defendants.

----------------------------------------x

JUDGE SAND

07 CIV 8535

COMPLAINT

ECF Case

JURY TRIAL DEMANDED

Charles Brainard ("Brainard" or "plaintiff"), by his attorneys, Vladeck, Waldman, Elias & Engelhard, P.C., for his complaint alleges as follows:

## INTRODUCTION

1. For thirty-eight (38) years, plaintiff was a partner in defendant Kenyon & Kenyon, LLP ("defendant" or the "Firm"), a firm specializing in intellectual property law. As a partner, plaintiff participated in the Kenyon & Kenyon Pension Plan ("Plan"), a defined benefit plan. In June 2005, the Plan paid Plaintiff his pension benefit in the form of a single lump sum distribution. In 2006, defendants declared that plaintiff had to return to the Plan $297,364 of his lump sum distribution. Defendants thereupon unilaterally withheld $105,625 from plaintiff's compensation for the period March 2006 through September 2006 and returned those monies to the Plan. For the period from October 2006 through September 2008, defendants are also unilaterally deducting $3,994.56 semi-monthly from the distributions from his memorandum account, which account represents his share of partnership profits, and returning those deductions

246625 v1

to the Plan. As the lump sum distribution of the pension benefit from the Plan was nonforfeitable, defendants' actions violate the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §1002 et seq.

## JURISDICTION AND VENUE

2. The Court has jurisdiction over this action pursuant to 28 U.S.C. §1331, 28 U.S.C. §1367, and Sections 502(a)(1)(B) and (3) of ERISA, 29 U.S.C. §1132(a)(1)(B) and (3). This action is brought to enforce ERISA's nonforfeitability rules and to recover benefits due under the Plan, to enjoin the defendants from deducting monies from plaintiff's memorandum account and returning them to the Plan, and to enjoin defendants from further violating Brainard's rights under both ERISA and the Plan. Venue is proper under Section 502(e)(2) of ERISA, 29 U.S.C. § 1132(e)(2). A supplemental claim pursuant to New York law is also brought to enforce plaintiff's contract rights with the Firm.

## THE PARTIES

3. Plaintiff, a resident of New York, New York, was born on April 12, 1933. He was a partner in the Firm from January 1, 1965 until he withdrew from it effective September 30, 2003. Plaintiff was "of counsel" to the firm from October 1, 2003 until September 30, 2006.

4. Plaintiff is a participant, as defined by Section 3 (7) of ERISA, 29 U.S.C. § 1002(7), in the Plan.

5. Until January 2006, the Firm was a partnership with its principal place of business located in New York, New York. Thereafter, the Firm functioned as a limited liability partnership. At all times relevant to this action, the Firm has been an "employer" within the meaning of Section 3(5) of ERISA, 29 U.S.C. §1002(5); the "administrator" of the Plan within

the meaning of Section 3(16)(A) of ERISA, 29 U.S.C. §1002(16)(A); and the "sponsor" of the Plan within the meaning of Section 3(16)(B) of ERISA, 29 U.S.C. §1002(16)(B).

6. The Plan is a defined benefit plan within the meaning of Section 3(35) of ERISA, 29 U.S.C. §1102(35).

7. Defendants George Badenoch and Michael Loughnane each is, and Robin Tobin, until September 30, 2006, was, a partner in the Firm, a member of its Pension Committee, and a fiduciary of the Plan within the meaning of Section 3(21)(A) of ERISA, 29 U.S.C. § 1002(21)(A).

## THE PLAN

8. The effective date of the Plan was October 1, 1989. Some of the partners waived participation in the Plan, but most of them, including Brainard, elected to participate in it.

9. The Plan's benefit formula was as follows: For each year after October 1, 1989, participants earned a future service credit equal to .65% of annual compensation. Highly compensated participants, such as Brainard, also earned one-tenth of their past service benefit per year for ten years beginning on October 1, 1989. The past service benefit was equal to .65% of past service compensation multiplied by years of service prior to October 1, 1989. Past service compensation meant the participant's average annual compensation for the three years ending on October 1, 1989.

10. In the September 1990 Agreement that established the Plan, the partners who elected to participate in it agreed with the Firm that the latter would charge each of them annually according to the unit credit funding method. Under this method, the Firm and the Plan's actuaries determined the actuarial cost to provide at normal retirement age the benefit that the partner earned each year under the prescribed formula. Each year, the Firm, in turn, required

each participating partner to contribute an amount equal to this cost of that year's earned future and past service benefits ("accrued benefit"). Brainard made all the contributions required under the September 1990 Agreement in accordance with the unit credit funding method from fiscal year ending ("FYE") September 30, 1990 through FYE September 30, 2003.

11. As of September 30, 2003, the Plan was frozen. After the freeze, the employees who had been eligible for coverage under the Plan, including participating partners, were not permitted to accrue any additional pension benefits under it. As participating partners were no longer accruing benefits under the Plan, there was no cost chargeable to them under the September 1990 Agreement with the Firm to use the unit credit funding method. According to the September 2003 Memorandum that announced the freeze, "[A]s you know, the Current D[efined] B[enefit] Plan is underfunded today and the Firm will continue to make contributions to that plan as required. The contributions required to the Current DB Plan after this year will constitute a general expense of the Firm."

## PLAINTIFF'S WITHDRAWAL FROM THE FIRM

12. Plaintiff withdrew from the Firm effective September 30, 2003. When Plaintiff withdrew from the Firm, defendants knew that the cost of a single lump sum distribution to him of his accrued benefit was increasing due to actuarial adjustments that were required to be made under the Plan and under the law. After his withdrawal, plaintiff, as "of counsel," was not responsible for the general expenses of the Firm.

13. The Firm's funding policy for the Plan in effect on July 11, 2005 and unchanged in this respect from October 1, 2003, as summarized on July 11, 2005 by the Firm's Pension Committee ("the July 2005 Memorandum"), was as follows:

> If a partner leaves the firm with an underfunded benefit, the amount of underfunding is allocated back to the remaining

246625 v1

4

partners. Currently, a terminating partner does not make up his or her underfunding either at termination or at distribution.

14. Under his withdrawal agreement from the partnership ("Withdrawal Agreement"), effective September 30, 2003, the Firm released Brainard "from all obligations owed ... of any kind or nature" by him.

15. Consistent with the Firm's applicable funding policies, including those described in paragraphs 10, 11 and 13, and the release in his Withdrawal Agreement, there was after September 30, 2003 no "expense" chargeable to plaintiff in connection with his accrued benefit in the Plan. If there had been or were, it would have been or was released in his Withdrawal Agreement.

16. Brainard's initial "of counsel" agreement, which was effective for the period October 1, 2003 to September 30, 2004 and which was automatically renewed for the period October 1, 2004 to September 30, 2005, provided in paragraph 1(b) that plaintiff "will, as far as he is permitted to do so by the providers of such plans and programs, continue to participate, at his own expense, in the Firm's life, health, accident/disability and pension plans and any other similar programs in which equity partners generally may participate." Equity partners could no longer "generally" participate in the Plan as it had been frozen as of September 30, 2003; the pension plans referenced in paragraph 1(b) of the "of counsel" agreement were the Firm's new cash balance plan, which was amended to permit plaintiff, as an "of counsel," to participate in it for the purpose of accruing additional benefits, and its Keogh/401(k) plan.

17. The July 2005 Memorandum also recommended that the Firm change its funding policies for the Plan. The recommendations (emphasis added) were as follows:

Q5.) What are the proposed changes to the funding policy?

246625 v1                                    5

. . . the current policy allows partners who terminate to receive their full benefits even if they have not fully funded their benefit. Unlike the current policy, terminating partners will now be required to make up their own underfunding upon termination. If the partner does not take a lump sum distribution (or start to receive an annuity) upon termination, there will be an additional final underfunding true-up calculation upon benefit distribution (or commencement if the annuity option is chosen). The terminated partner will be required to pay the Firm the true-up amount in order to complete the distribution process.

Any money recouped from terminating partners will be paid to the trust as additional contributions.

Q7.) What will allow the firm to recoup the underfunding from terminating partners?

CCA has many law firm clients that have amended their partnership agreement in order to insure that terminating partners pay all outstanding pension plan related underfunding before they receive any distributions from their defined benefit plans. The underfunding calculated for a partner upon termination of employment with the firm will be held back from their capital account.

<u>An amendment to the partnership agreement can also include language for partners who become of counsel (or directly in the of counsel agreement) and for post-65 underfunding</u>. (emphasis added)

\* \* \*

18.     The July 2005 memorandum recognized that Brainard's "of counsel" agreement would have to be changed (subject to his consent) in order to authorize the Firm and the Plan to recoup any purported underfunding of the present lump sum value of his accrued benefit.

19.     Neither Brainard's "of counsel" agreement for the period October 1, 2004 through September 30, 2005 nor his "of counsel" agreement for the period October 1, 2005

through September 30, 2006 was changed to authorize the Firm and the Plan to recoup from him retroactively any purported underfunding of the present lump sum value of his accrued benefit.

20. On June 30, 2005, the Plan paid Brainard his accrued benefit in the form of a single lump sum distribution of $1,019,817.66. This distribution was nonforfeitable within the meaning of Section 3(19) of ERISA, 29 U.S.C. §1002(19).

### COUNT I

21. Plaintiffs repeat and re-allege paragraphs 1 - 20 as if fully set forth herein.

22. Section 203(a) of ERISA, 29 U.S.C. § 1053(a), provides that an employee's right to his normal retirement benefit is nonforfeitable upon the attainment of normal retirement age [65]." Under Section 203(a)(3)(B) of ERISA, 29 U.S.C. § 1053(a)(3)(B), the nonforfeitability rule applies when the employee continues to work past normal retirement age as Brainard did. Section 204(c) of ERISA, 29 U.S.C. § 1054(c), states that if an employee's accrued benefit is determined in an amount other than a normal retirement age annuity, then that amount must be the actuarial equivalent of such an annuity. Moreover, the Plan further provided that when an employee worked past normal retirement age, the amount of his or her pension benefit would be the greater of: (1) "the Actuarial Equivalent value of his Accrued Benefit determined as of his Normal Retirement Date to his actual retirement date," or (2) his pension benefit based on his compensation and years of service to his actual retirement date. Section 409 (a)(9) of the Internal Revenue Code, 26 U.S.C. § 401(a)(9), also provides that an employee's accrued benefit shall be actuarially increased to take into account any period after age 70 ½ when there is a delay in making the lump sum distribution.

23. The repayment or return of all or part of a distribution is required under Section 4.03 of the Plan and permitted under Treasury regulations, as an exception to the

nonforfeitability rule, only when a terminated or inactive participant becomes re-employed and seeks to reinstate his accrued benefit and benefit rights. 26 C.F.R. § 1.411(a)-4.

24. Acting through Badenoch, Loughnane, and Tobin, the Firm unilaterally withheld plaintiff's compensation as an "of counsel" between April 1, 2006 to September 30, 2006, an amount equal to $105,625. Defendants also declared their intention to withhold unilaterally an additional $191,739 from plaintiff's memorandum account commencing October 1, 2006. (The memorandum account represents plaintiff's share of Firm profits that are scheduled to be distributed to him in two equal payments each month between October 1, 2003 and September 30, 2008.) To that end, the Firm has been since October 1, 2006 and is now deducting $3,994.56 twice a month from his distributions. The Firm is withholding without Brainard's permission a total of $297,364 and returning that amount to the Plan.

25. By engaging in the conduct described in paragraph 24, defendants violated the nonforfeitability rules of ERISA.

26. By engaging in the conduct described in paragraphs 24 and 25, defendants Badenoch, Loughnane and Tobin breached their duties as fiduciaries under ERISA Section 404(a)(1)(A)&(D), 29 U.S.C. §1104(a)(1)(A)&(D).

## COUNT II

(Supplemental Jurisdiction – Jury Trial Demanded)

27. Plaintiffs repeat and re-allege paragraphs 1 - 26 as if fully set forth herein.

28. By engaging in the conduct described in paragraph 24, the Firm breached its Withdrawal Agreement with Brainard, its "of counsel" agreements with him, and its September 1990 Agreement to use the unit credit funding method with him and the other participating partners.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays that the Court enter a judgment:

1. Ordering the Plan to repay plaintiff $142,635.16, the amount deducted from his "of counsel" compensation and from his memorandum account between March 2006 and August 2007, as well as any other monies deducted from his memorandum account after August 2007 and turned over to the Plan by the Firm;

2. Enjoining defendants from deducting any other monies from his memorandum account;

3. Ordering the Firm and defendants Badenoch, Loughnane, and Tobin to pay reasonable attorneys' fees and costs of the action; and

4. Ordering defendants to provide such other relief as the Court deems appropriate.

## DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, plaintiff demands a trial by jury in this action.

Dated:   October 2, 2007
         New York, New York

                                         VLADECK, WALDMAN, ELIAS &
                                         ENGELHARD, P.C.

                                   By:   _____
                                         Debra L. Raskin (DR 5431)
                                         James Wasserman (JW 3717)
                                         1501 Broadway, Suite 800
                                         New York, New York 10036
                                         (212) 403-7300