UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
CHARLES BRAINARD,

                          Plaintiff,                    ECF Case

   - against -

                                     Case No. 07 CIV 8535 (LBS)

KENYON & KENYON LLP, the KENYON &
KENYON PENSION PLAN, and GEORGE
BADENOCH, MICHAEL LOUGHNANE, and
ROBERT TOBIN as fiduciaries of the KENYON &
KENYON PENSION PLAN,

                       Defendants
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

---

PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'
MOTION TO
(1) DISMISS COUNTS I & II OF THE COMPLAINT, OR,
IN THE ALTERNATIVE,
(2) STAY COUNT I AND REFER COUNT II TO ARBITRATION

---

                                          VLADECK, WALDMAN, ELIAS &
                                           ENGELHARD, P.C.
                                           Attorneys for Plaintiff
                                           1501 Broadway, Suite 800
                                           New York, New York 10036
                                           (212) 403-7300

Of Counsel:
       Debra L. Raskin
       James Wasserman

### TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

PRELIMINARY STATEMENT ....................................................................................... 1

BACKGROUND ............................................................................................................. 3

   A.  The Plan .................................................................................... 3

   B.  Brainard ................................................................................... 5

   C.  The Funding of the Plan ........................................................... 5

   D.  The Disputed Interpretation of the Plan .................................... 7

ARGUMENT .................................................................................................................. 9

 I.  THE COMPLAINT ALLEGES A DISPUTE UNDER ERISA TO RECOVER BENEFITS FROM A DEFINED BENEFIT PENSION PLAN .................................................................................................... 10

 II.  PLAINTIFF HAS STANDING UNDER ERISA TO RECOVER THE PORTION OF HIS BENEFIT THAT HAS ALREADY BEEN RETURNED TO THE PLAN .................................................................. 11

   A.  Plaintiff Is A Participant ......................................................... 12

   B.  Section 502(a)(1)(B) Authorizes the Relief Sought .................. 13

 III.  THE DISPUTE IS NOT ARBITRABLE ............................................. 15

   A.  The ERISA Claim Is Not Arbitrable ....................................... 15

   B.  Count II Is Not Arbitrable ...................................................... 16

 IV.  A STAY IS NOT WARRANTED ...................................................... 19

CONCLUSION ............................................................................................................. 21

## TABLE OF AUTHORITIES

### CASES

AIM Int'l Trading, L.L.C. v. Valcucine S.p.A.,
     No. 02 Civ. 1363, 2003 WL 21203503 (S.D.N.Y. May 22, 2003)....................................19

AT&T Techs., Inc. v. Commc'ns Workers,
     475 U.S. 643 (1986)......................................................................................................15

American Shipping Line, Inc. v. Massan Shipping Indus., Inc.,
     885 F. Supp. 499 (S.D.N.Y. 1995) ...............................................................................20

Bell Atlantic v. Twombly,
     127 S. Ct. 1955 (2007)..................................................................................................10

Chambers v. Time Warner, Inc.,
     282 F.3d 147 (2d Cir. 2002)........................................................................................3, 9

Citrus Marketing Board of Israel v. J. Lauritzen A/S,
     943 F.2d 220 (2d Cir. 1991)..........................................................................................21

Collins & Aikman Prods. Co. v. Bldg. Sys., Inc.,
     58 F.3d 16 (2d Cir. 1995)..............................................................................................19

Cornell Univ. v. UAW Local 2300,
     942 F.2d 138 (2d Cir. 1991)..........................................................................................18

Crocco v. Xerox Corp.,
     137 F.3d 105 (2d Cir. 1998)............................................................................................1

Cronas v. Willis Group Holdings Ltd.,
     No. 06 Civ. 15295, 2007 WL 2739769 (S.D.N.Y. Sept. 17, 2007)..................................16

Dean Witter Reynolds, Inc. v. Byrd,
     470 U.S. 213 (1985)......................................................................................................20

Fairmont Shipping (H.K.) Ltd. v. Primary Indus. Corp.,
     No. 86 Civ. 3668, 1988 WL 7805 (S.D.N.Y. Jan. 25, 1988), aff'd, 940 F. 2d 649
     (2d Cir. 1991)................................................................................................................18

Firestone Tire & Rubber Co. v. Bruch,
     489 U.S. 101 (1989)......................................................................................................12

Genesco, Inc. v. T. Kakiuchi & Co.,
     815 F.2d 840 (2d Cir. 1987)..........................................................................................20

Graphic Commc'ns Int'l Union v. Case-Hoyt Corp.,

No. 95-CV-1624, 1997 WL 610765 (N.D.N.Y. Sept. 25, 1997) .......................................18

Great-West Life & Annuity Ins. v. Knudson,
    534 U.S. 204 (2002) ...............................................................................................14

Hoffman v. Aaron Kamhi, Inc.,
    927 F. Supp. 640 (S.D.N.Y. 1996) ......................................................................16

Iqbal v. Hasty,
    490 F.3d 143 (2d Cir. 2007)...................................................................................10

In re J.P. Morgan Chase Cash Balance Litigation,
    242 F.R.D. 265 (S.D.N.Y. 2007) ...................................................................12, 13

Kuntz v. Reese,
    785 F.2d 1410 (9th Cir. 1986) ..............................................................................12

Massachusetts Mut. Life Ins. Co. v. Russell,
    473 U.S. 134 (1985)...............................................................................................13

Mertens v. Hewitt Assocs.,
    508 U.S. 248 (1993) ..............................................................................................14

Mitchell v. Mobil Oil Corp.,
    896 F.2d 463 (10th Cir. 1990) ..............................................................................12

Mullins v. Pfizer, Inc.,
    23 F.3d 663 (2d Cir. 1994)....................................................................................13

Prudential Lines, Inc. v. Exxon Corp.,
    704 F.2d 59 (2d Cir. 1983)....................................................................................18

Rich v. Salomon Smith Barney, Inc.,
    No. 02 Civ. 3288, 2006 WL 709101 (S.D.N.Y. Mar. 21, 2006) ........................17

Saladino v. I.L.G.W.U. Nat'l Retirement Fund,
    754 F.2d 473 (2d Cir. 1985)..................................................................................12

Seaboard Coast Line R.R. Co. v. Trailer Train Co.,
    690 F.2d 1341 (11th Cir. 1982) ............................................................................18

Shinehouse v. Guerin,
    20 Empl. Benefits Cas. (BNA) 2422 (3d Cir. 1997)...........................................12

Sierra Rutile Ltd. v. Katz,
    937 F.2d 743 (2d Cir. 1991)..................................................................................20

Swierkiewicz v. Sorema N.A.,

249249 v1

534 U.S. 506 (2002)......................................................................................................10

Teagardener v. Republic-Franklin Inc. Pension Plan,
    909 F.2d 947 (6th Cir. 1990) ...................................................................................12

Tenneco Inc. v. First Va. Bank of Tidewater,
    698 F.2d 688 (4th Cir. 1983) .............................................................................12, 14

Trucking Employees of North Jersey Welfare Fund, Inc. v. Colville,
    16 F.3d 52 (3d Cir. 1994).........................................................................................12

WorldCrisa Corp. v. Armstrong,
    129 F.3d 71 (2d Cir. 1997)........................................................................................20

## STATUTES

29 U.S.C. §1002 et seq................................................................................. passim

29 U.S.C. §1002(19) ........................................................................................................5

29 U.S.C. §1002(34) ........................................................................................................4

29 U.S.C. §1132(a)(1)(B) ..........................................................................................13, 14

29 U.S.C. §1132(a)(3).....................................................................................................14

Fed. R. Civ. P. 12(b)(6)....................................................................................................9

PRELIMINARY STATEMENT

Charles Brainard ("Brainard" or "plaintiff") respectfully submits this memorandum in opposition to Defendants' Memorandum in Support of their Motion to (1) Dismiss Counts I & II of the Complaint or, in the alternative, (2) Stay Count I and Refer Count II to Arbitration ("Def. Mem."). For the reasons set forth below, the Court should deny the motion to dismiss and the motion for a stay.

For 38 years, Brainard was a partner specializing in intellectual property law at Kenyon & Kenyon, LLP. ("Kenyon" or the "Firm")  On September 30, 2003, pursuant to the Firm's mandatory retirement requirement and a withdrawal agreement dated September 5, 2003 (the "Withdrawal Agreement"), he withdrew from the Firm.  He worked in "of counsel" status pursuant to two separate agreements until September 30, 2006. (Complaint ¶1)

In 2005, the Kenyon & Kenyon Pension Plan ("the Plan")[1] made a lump sum distribution to Brainard of approximately $1 million, a figure that, under the Plan formula, reflected his significant tenure and the level of compensation that he had earned as a partner. Although defendants acknowledge that this sum represented "every dollar of benefits owed to [Brainard] under the Plan," (Def. Mem. 1), in 2006, Kenyon, as the Plan Administrator,[2] nevertheless decided that Brainard had to return approximately $300,000 of the $1 million distribution back to the Plan.  Since that decision, the Firm as Plan Administrator has compelled Brainard to return approximately $205,000 to the Plan, by deducting without his consent monies

---

[1]    A copy of the Plan including amendments thereto was provided as Exhibit A to Def. Mem.  This memorandum will cite exhibits to Def. Mem. as "Def. Mem., Ex. _."

[2]    The Employee Retirement Income Security Act ("ERISA") provides that that the entity or individual who is designated by the plan as the plan administrator is an appropriate defendant in a lawsuit to recover benefits. Crocco v. Xerox Corp., 137 F.3d 105, 107 (2d Cir. 1998).  Here, the plan designates Kenyon as the plan administrator (Complaint ¶5), and the latter is being sued in that capacity under Count I.

from distributions concededly owed him under the Withdrawal Agreement[3] and from his monthly compensation as "of counsel" to the Firm. (Complaint ¶¶1, 20)

When the Plan was established in 1990, the partners who elected to participate entered into an agreement with the Firm (the "September 1990 Agreement") to fund the pension earned each year by the unit credit funding method. That is, each year each partner would earn a specified future pension amount and each year the partner would contribute an amount to fund that pension amount fully. Brainard paid all those amounts and his pension was acknowledged as earned and vested by the Firm/Administrator; all his obligations under the 1990 Agreement were met. (Complaint ¶10)

By 2005 when the Plan paid Brainard his pension in the form of a lump sum, defendants already knew that his payments under the September 1990 Agreement, with actual earnings and interest, would not cover the full cost of his lump sum distribution. Defendants also admitted publicly that under the defendants' then-existing policy, responsibility for the "shortfall" belonged to the remaining partners. (Complaint ¶11) The Firm/Administrator and the individual defendants as fiduciaries, however, refused to accept this responsibility, and so, fraudulently re-interpreted the Plan and decided that the payment to plaintiff would not be the pension benefit the Plan formula provided. Rather, defendants stated that plaintiff was entitled only to the amount of a so-called hypothetical asset account and that the Plan's "intent" was to limit his pension benefit to the value of his contributions to that hypothetical account and the hypothetical interest thereon.[4] In doing so, the Plan and Firm as Plan Administrator retroactively required a

---

[3]    The payments under the Withdrawal Agreement come from Brainard's "memorandum accounts," a device that allowed for delayed distribution of his share of partnership profits. (Complaint ¶1)

[4]    Complaint ¶24; Declaration of Charles Brainard dated January 15, 2008 ("Brainard Decl."), Exs. F, G. The Brainard Declaration provides copies of documents cited by or integral

forfeiture of a nonforfeitable benefit and violated the terms of the Plan and the basic tenets of federal pension law.

Count I is brought under ERISA by Brainard against the Plan, the Firm in its capacity as Plan Administrator, and the individual Plan fiduciaries. Under Count I, Brainard seeks a declaration that the full $1 million pension lump sum was nonforfeitable and also requests recovery from the Plan of the balance of the approximately $205,364 that the Plan has improperly recouped and retained. Count I also seeks to enjoin the Firm/Administrator and the Plan's fiduciaries from deducting and transferring to the Plan any more monies from Brainard's distributions under the Withdrawal Agreement. Count II is brought in the alternative against the Firm qua Firm for a declaration that Brainard owes the Firm no money under the Withdrawal Agreement, under the two agreements that governed Brainard's "of counsel" status, and under the September 1990 Agreement between him and the Firm. Count II also seeks the return of the funds that were impermissibly withheld for the Plan.

Defendants erroneously contend that plaintiff lacks standing under ERISA and that ERISA does not provide the relief he seeks. As demonstrated below, defendants' arguments concerning ERISA are wrong, as are their contentions that Count II is subject to arbitration and that this proceeding accordingly should be dismissed or stayed.

BACKGROUND

A.    The Plan

Count I is brought under ERISA, 29 U.S.C. §1002 et seq. ERISA allows two types of pension plans: individual account plans, which are also known as defined contribution

---

to the Complaint and that therefore can be considered on a motion to dismiss. See Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002).

plans, and defined benefit plans.  The distinction between these two types of pension plans is critical to this case.

An individual account plan "means a pension plan which provides for an individual account for each participant and for benefits based solely upon the amount contributed to the participant's account, and any income . . . allocated to such participant's account." 29 U.S.C. §1002(34).  The accrued benefit under an individual account plan is "the balance of the individual's account." 29 U.S.C. §1002(23)(B).  A defined benefit plan "means a pension plan other than an individual account plan." 29 U.S.C. §1002(35).  The accrued benefit under a defined benefit plan means "the individual's accrued benefit determined under the plan . . . , expressed in the form of an annual benefit commencing at normal retirement age." 29 U.S.C. §1002(23)(A).

Established for most of the partners including Brainard, the Plan is a defined benefit plan (Complaint ¶6), not an individual account plan.  It became effective on October 1, 1989. (Id. ¶8).  Brainard's accrued benefit, as converted to a lump sum, was determined using a formula based upon a percentage of compensation and years of credited service. (Complaint ¶9; Def. Mem., Ex. A, DBP 000051, DBP 000017-18)

Kenyon is the Administrator of the Plan. (Complaint ¶5; Def. Mem., Ex. A, DBP 000045, DBP 000145)  As such, the Firm is authorized with specific limitations to "construe the terms of the Plan," provided, however, that any such construction or interpretation "shall comply with the terms of the Act and all regulations issued pursuant thereto," (Def. Mem., Ex. A, DBP 000045, DBP 000145) a reference to ERISA. (Id., DBP 000032)  The Firm bears the cost of the Plan. (Id., DBP 000050, DBP 000143)

249249 v1                                                    4

B.    Brainard

Brainard was a partner in the Firm for 38 years. (Complaint ¶1)  He withdrew from the Firm on September 30, 2003 and was "of counsel" for the three-year period between October 1, 2003 and September 30, 2006 pursuant to two "of counsel" contracts. (Id. ¶¶12, 16, 19)  On June 30, 2005, the Plan paid Brainard his accrued benefit, converted from an annual annuity to a single lump sum distribution of $1,019,817.66.  This distribution was nonforfeitable within the meaning of Section 3(19) of ERISA, 29 U.S.C. §1002(19). (Id. ¶20)

C.    The Funding of the Plan

In the September 1990 Agreement that established the Plan, the partners including Brainard who elected to participate, agreed that the Firm would charge each of them annually a portion of the entire cost of the Plan according to the unit credit funding method.  Under this method, the Firm and the Plan's actuaries determined the actuarial cost to provide at normal retirement age the benefit that the partner earned each year under the prescribed formula.  Each year, each participating partner was required to contribute to the Firm an amount equal to the cost of that year's earned pension benefits for current and past service ("accrued benefit").  From fiscal year ending ("FYE") September 30, 1990 through FYE September 30, 2003, Brainard made all the contributions to the Firm required by the unit credit funding method under the September 1990 Agreement. (Complaint ¶10)

At some point after Brainard withdrew from the Firm, defendants apparently decided to disregard that he had made all contributions required of him under the unit credit funding method set forth in the September 1990 Agreement.  Instead, they calculated the difference between the pension benefit the Plan provided and the lesser benefit that would have been provided by an individual account plan, and then simply called that difference between the two benefit amounts "underfunding."  (Complaint ¶24; Brainard Decl., Ex. F)

Defendants then appear to have posed the following question: What happens when the Plan's benefit formula entitled a partner to a pension benefit that was larger than what would have been provided by an individual or so-called hypothetical asset account?[5]   In a memorandum dated July 11, 2005 (the "July 2005 Memorandum"), the Firm's Pension Committee summarized the policy that equated that difference with an "underfunding" of the Plan:

> Q4.) What happens when a partner leaves the Firm?
>
> If a partner leaves the firm with an underfunded benefit, the amount of underfunding is allocated back to the remaining partners.  <u>Currently, a terminating partner does not make up his or her underfunding either at termination or at distribution.</u>
>
> Q5.) What are the proposed changes to the current funding policy?
>
> [T]he current policy allows partners who terminate to receive their full benefit even if they have not fully funded their benefit.  Unlike the current policy, terminating partners will now be required to make up their own underfunding upon termination.  If the partner does not take a lump sum distribution (or start to receive an annuity) upon termination, there will be an additional final underfunding true-up calculation upon benefit distribution (or commencement if the annuity option is chosen).  The terminated partner will be required to pay the Firm the true-up amount in order to complete the distribution process.

---

[5]     The "hypothetical asset account" method of determining the benefit (Brainard Decl., Ex. F) is not provided for in the Plan.  The September 1990 Agreement states:

> The regulations under [Internal Revenue] Code Section 401(a)(26) does not permit a separate asset account to be maintained under the [P]lan for each partner.  Rather, a partner is eligible to receive the value of his accrued pension benefit.  It is not permitted to make an adjustment outside the [P]lan for the difference between a hypothetical asset account maintained for a partner and the actuarial value of his benefits.

(Brainard Decl., Ex. D, B00019)   Thus, defendants recognized that the "hypothetical asset account" method of determining benefits is impermissible.

Any money recouped from terminating partners will be paid to the trust as additional contributions.

Q7.) What will allow the Firm to recoup the underfunding from terminating partners?

[The Firm's pension advisory service] has many law firm clients that have amended their partnership agreement in order to insure that terminating partners pay all outstanding pension plan related underfunding before they receive any distributions from their defined benefit plans. The underfunding calculated for a partner upon termination of employment with the firm will be held back from their capital account.

<u>An amendment to the partnership agreement can also include language for partners who become of counsel (or directly in the of counsel agreement) and for post-65 underfunding.</u>

(Complaint ¶¶13, 17; Brainard Decl., Ex. F; emphasis supplied)

The July 2005 Memorandum recognized that Brainard's "of counsel" agreements would have to be changed (subject to his consent) in order to authorize the Firm and the Plan to recoup any purported underfunding of the lump sum present value of his accrued benefit. (Complaint ¶18)   Neither Brainard's "of counsel" agreement for the period October 1, 2003 through September 30, 2005 nor his "of counsel" agreement for the period October 1, 2005 through September 30, 2006 was amended to authorize the Firm and the Plan to recoup from him any of this purported underfunding, much less to do so retroactively. (<u>Id.</u> ¶19)

D.    <u>The Disputed Interpretation of the Plan</u>

In 2006, defendants "declared that [plaintiff] had to return to the Plan $297,364 of his [2005] lump sum distribution." (Complaint ¶1)   Between April 1 and September 30, 2006, the Firm/Administrator withheld $105,625 unilaterally from plaintiff's "of counsel" compensation and returned that money to the Plan.   The Firm/Administrator then declared its intention to withhold unilaterally an additional $191,739 from plaintiff's memorandum accounts distributions commencing October 1, 2006." (Complaint ¶24)   Defendants so stated in two e-mails to plaintiff

from the "Joint Committees of the D[efined B[enefit] P[lan]" ("Joint Plan Committees"), dated

October 3, 2006 and October 12, 2006, respectively. (Complaint ¶¶1, 24; Brainard Decl., Ex. G)

   The first e-mail forwards to plaintiff the "Decision of Joint Committees on DBP."

It states as follows:

> As you know, since our meeting on September 7, the joint
> Committees (Management, Percentage, Executive and Pension)
> have been considering your position regarding the approximately
> $300,000 excess distribution to you from the Defined Benefit Plan
> (DBP) trust beyond the sum of your contributions, plus interest at
> the DBP's defined interest rates.   If the $300,000 excess
> distribution is not refunded to the DBP trust, the current partners
> would be required personally to make up that shortfall under the
> prevailing conditions.
>
> The joint Committees have decided that it is not appropriate for the
> Firm to relieve you of what we feel is an obligation to return the
> $300,000 excess distribution to the DBP trust.  We do not believe
> that it was the intent of the plan that "windfall" monies, that is,
> those beyond a partner's contributions to the plan plus accumulated
> interest, be retained, and certainly there can be no argument that
> you ought to be permitted to withdraw distributions not made by
> you to the DBP.

(Brainard Decl., Ex. G; emphasis supplied)

   The October 12, 2006 e-mail shows that by that date, the Firm/Administrator had

already deducted $105,625 from Brainard's "of counsel" compensation and returned it to the

Plan.  The same e-mail further declared that the Firm/Administrator would begin deducting

another $3,994.56 every two weeks from the distributions that were owed Brainard for his share

of the Firm's profits (the memorandum accounts) and returning that amount to the Plan until the

full amount of the purported excess distribution of $297,364 was refunded.  Thus, there can be

no doubt that the impermissible recoupment was done by the Plan and for the Plan, contrary to

defendants' assertion that the dispute here is only with the Firm. (Def. Mem. 2)

   In determining that an "excess" distribution was made to Brainard from the Plan,

defendants ignored the Plan's benefit formula which generated a lump sum distribution of

$1,019,817.66. Instead, defendants impermissibly cast the Plan as an individual account plan, thereby limiting Brainard's accrued benefit to the sum of his contributions to the Plan plus hypothetical interest, which entitled him, in their erroneous view, to a lump sum of only $722,453.66. This ad hoc, after-the-fact, and arbitrary conversion of the Plan, a defined benefit plan, into an individual account plan violates the terms of the Plan and imposes a $297,364 forfeiture of a benefit that cannot be forfeited under ERISA. (Complaint ¶25)

By October 2, 2007, the date the complaint was filed, 15 months after defendants' impermissible recasting of the Plan, a total of $205,364[6] of this "excess" distribution has been returned to the Plan without Brainard's permission. The balance of this "excess," $92,000 remained under the Firm/Administrator's control, as defendants continued to deduct for the benefit of the Plan $3,994.56 semi-monthly from payments otherwise owed to Brainard.

## ARGUMENT

In reviewing a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the Court must accept "all factual allegations in the complaint as true, and draw[] all reasonable inferences in the plaintiff's favor." Chambers, 282 F.3d at 152. A complaint must "amplify a claim with some

---

[6]    The Complaint, Prayer for Relief ¶1, calculated the withheld amount as $142,635.16. This figure has been corrected for an arithmetic error and updated through September 30, 2007. Thus, the October 12, 2006 e-mail admitted that $105,625 had been withheld from Brainard's "of counsel" compensation between April and September 2006. (Brainard Decl., Ex. G)   In accordance with the schedule set forth in that e-mail, once Brainard's employment as "of counsel" ceased on September 30, 2006, defendants began deducting $3,994.56 from his memorandum accounts semi-monthly; these deductions were labeled "Defined Benefit." The pay stub for December 31, 2006 showed that a total of $23,967.36 in such installments was deducted in 2006 for the Defined Benefit Plan. (Id., Ex. H)  Through October 15, 2007, the "Defined Benefit" deductions totaled $75,771.64. (Id., Ex. I) The total of the "Defined Benefit" deductions for 2006 and 2007 and the amount withheld from Brainard's "of counsel" compensation in 2006 amounted to $205,364.

After the Complaint was filed, the defendants began returning to Brainard the "of counsel" compensation withheld in 2006. By December 31, 2007, $80,133.52 had been returned. Apparently recognizing the impermissible nature of that recoupment, defendants now say that they want to deduct the full $297,364 from his memorandum accounts. (Def. Mem. 13-14 n.6)

factual allegations in those contexts where such amplification is needed to render the claim plausible." Iqbal v. Hasty, 490 F.3d 143, 157-58 (2d Cir. 2007).[7] Plaintiff easily satisfies this standard.

I.    THE COMPLAINT ALLEGES A DISPUTE UNDER ERISA TO
      RECOVER BENEFITS FROM A DEFINED BENEFIT PENSION PLAN

Defendants allege that "it is undeniable that the Plan has not (nor is it alleged to have) taken any actions to recover any benefits distributed to Brainard." (Def. Mem. 7). By painting plaintiff as having a dispute with the Firm, defendants would require the Court to disregard most of the Complaint.

Paragraph 1 of the Complaint (emphasis supplied) alleges that: "In June 2005, the Plan paid Plaintiff his pension benefit in the form of a single lump sum distribution. In 2006, defendants declared that plaintiff had to return to the Plan $297,364 of his lump sum distribution." Paragraph 2 of the Complaint specifically states that the action is brought, inter alia, "to recover benefits due under the Plan." As noted earlier, paragraph 5 alleges that Kenyon is the Administrator of the Plan. Paragraph 24 alleges that the Firm (as Administrator) "is withholding without Brainard's permission a total of $297,364 [from his "of counsel" compensation and from his memorandum accounts] and returning that amount to the Plan." Paragraph 25 alleges that this conduct constitutes a forfeiture of part of his lump sum pension payment. These are all ERISA claims about Plan benefits being improperly withheld by a Plan and its Administrator.

---

[7]    In Iqbal, 490 F.3d at 155, the Court noted, "Considerable uncertainty concerning the standard for assessing the adequacy of pleadings has recently been created by the Supreme Court's decision in Bell Atlantic v. Twombly, [127 S. Ct. 1955 (2007)]." Nevertheless, the Second Circuit has adhered to the requirement that on a motion to dismiss, the factual allegations of a complaint be accepted as true. Iqbal, 490 F.3d at 147, 152; see Swierkiewicz v. Sorema N.A., 534 U.S. 506, 508 n.1 (2002)

Equally troubling is defendants' failure to accept as true other facts alleged in the Complaint. Thus, the heart of the dispute is the Joint Plan Committees' decision that it was never "the intent of the [P]lan that 'windfall' monies, that is, those beyond a partner's contributions to the [P]lan plus accumulated interest, be retained." (Brainard Decl., Ex. G; emphasis supplied) It is on the basis of this erroneous "construction" of the Plan that the Firm/Administrator has taken steps to "return the $300,000 excess distribution to the D[efined] B[enefit] P[lan] trust." (Id.) The Joint Plan Committees' decision construes the Plan, a defined benefit plan, as an individual account plan (or defined contribution plan) and declares that Brainard, as a result, should forfeit $297,364 of his lump sum distribution. (Complaint ¶25) This determination about the Plan is to be accomplished by the Firm/Administrator through self-help: seizing $191,739 from Brainard's memorandum accounts distributions and another $105,625 from his "of counsel" paychecks, both actions without plaintiff's authorization.

As alleged, this is not a dispute between Brainard and the Firm, as defendants contend, but rather is Brainard's challenge under ERISA to actions defendants took on the basis of their construction of the Plan and to benefit the Plan. Count I does not raise a dispute "as to whether Brainard is obligated to repay the Firm monies" under the "September 1990 Agreement" or "any other Firm subsequent expense-sharing agreement." (Def. Mem. 7).

II.    PLAINTIFF HAS STANDING UNDER ERISA TO RECOVER THE PORTION OF HIS BENEFIT THAT HAS ALREADY BEEN RETURNED TO THE PLAN

Defendants claim that ERISA does not give Brainard the right to recover any money from the Plan for two reasons. First, they argue that he is no longer a participant in the plan because he was paid his full nonforfeitable benefit of $1,019,817.66 on June 30, 2005 and therefore now lacks standing to sue. (Def. Mem. 5-8) Second, defendants contend that because the $205,364 seized to date and returned to the Plan is not held in an identifiable account, equitable relief is not available under ERISA. (Id. at 8-11) Both arguments are wrong.

A.    Plaintiff Is A Participant

As noted above, defendants seized and refunded to the Plan $205,364 from other monies being paid or distributed to Brainard.  Brainard has sued to recover this portion of his original lump sum that has now been denied him and remains a plan participant until his full benefit is paid back to him.  As the monies returned to the Plan to date remain in the hands of a pension plan trustee or administrator, they are subject to ERISA's protective provisions.  See Tenneco Inc. v. First Va. Bank of Tidewater, 698 F.2d 688 (4th Cir. 1983) ($5,000 balance in two pension accounts "remains in the hands of the trustee" and therefore is protected by ERISA's anti-alienation provisions); Shinehouse v. Guerin, 20 Empl. Benefits Cas. (BNA) 2422 (3d Cir. 1997) (same; a copy is attached as Exhibit A to this memorandum); Trucking Employees of North Jersey Welfare Fund, Inc. v. Colville, 16 F.3d 52, 56 (3d Cir. 1994) (standing depends upon whether "the funds are no longer in the hands of the pension plan trustee").  Defendants' first argument is therefore without merit.

The cases defendants cite (Def. Mem. 5-6) are not to the contrary.[8]  Thus in In re J.P. Morgan Chase Cash Balance Litigation, 242 F.R.D. 265, 271 (S.D.N.Y. 2007), this Court acknowledged that former employees may still be eligible to receive benefits and therefore have standing under ERISA where, as here, the "calculation of benefits under the terms of the plan [i]s challenged, not the plan itself."  That decision also recognized the Second Circuit's concern "that

---

[8]    See Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101 (1989) (plaintiffs had standing to challenge denial of severance plan benefits, but could not challenge former employer's failure to produce plan documents); Kuntz v. Reese, 785 F.2d 1410 (9th Cir. 1986) (failure to produce plan documents to former employees); Mitchell v. Mobil Oil Corp., 896 F.2d 463, 473-74 (10th Cir. 1990) (no standing where plaintiff claimed damages because plan amendment wrongfully induced him to retire, but did not claim "that [defendant] had improperly withheld vested benefits"); Teagardener v. Republic-Franklin Inc. Pension Plan, 909 F.2d 947, 952-54 (6th Cir. 1990) (plaintiffs who received all vested benefits lacked standing to claim residual plan funds); Saladino v. I.L.G.W.U. Nat'l Retirement Fund, 754 F.2d 473, 477 (2d Cir. 1985) ("undisputed that [former employee] lacks any colorable claim to eligibility" under the plan).

a plan fiduciary could destroy employee standing . . . through their own bad acts." <u>Id.</u> at 272 (discussing <u>Mullins v. Pfizer, Inc.</u>, 23 F.3d 663 (2d Cir. 1994)). In similar fashion, defendants here slash Brainard's benefits under the Plan and then disingenuously seek to deprive him of participant status by their backdoor recoupment of those benefits.

      B.    <u>Section 502(a)(1)(B) Authorizes the Relief Sought</u>

Defendants' second argument also fails, as it is premised upon the false assertion that this case was brought solely under Section 502(a)(3) of ERISA which authorizes equitable relief and not under Section 502(a)(1)(B) as well. (Def. Mem. 8)

Paragraph 2 of the Complaint specifically states that the action is brought, <u>inter alia,</u> "to enforce ERISA's nonforfeitability rules and recover benefits due under the Plan," pursuant to Section 502(a)(1)(B), 29 U.S.C. §1132(a)(1)(B). Section 502(a)(1)(B) provides (emphasis supplied) that "[a] civil action may be brought – by a participant or beneficiary – to <u>recover benefits due him under the terms of his plan,</u> to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." This section enables plaintiff to sue "to recover accrued benefits, to obtain a declaratory judgment that he is entitled to benefits under the provisions of the plan contract, and to enjoin the plan administrator from improperly refusing to pay benefits in the future." <u>Massachusetts Mut. Life Ins. Co. v. Russell</u>, 473 U. S. 134, 147 (1985). Brainard seeks a declaration that the full $1 million was nonforfeitable and recovery from the Plan of the balance of $297,364 that is due him as a result. This relief is fully within the parameters of Section 502(a)(1)(B). <u>Id.</u>

The claim for the funds that have been improperly recouped by and are now held by the Plan, therefore, is a claim for benefits and not, as defendants assert, an effort to disguise a money damage claim as a request for equitable relief. In support of that erroneous contention, defendants cite a line of cases in which plaintiffs attempt to recover damages under Section

502(a)(3) from a participant or third party. (Def. Mem. at 8-11)  The limitations developed in these cases do not apply to a Section 502(a)(1)(B) claim for benefits.[9]  To hold otherwise would effectively negate that section.  Thus, under defendants' theory, participants would never be able to recover improperly withheld benefits from a defined benefit plan because such relief entails money damages and because such plans do not allocate and hold participants' monies in identifiable individual accounts.  Defendants' interpretation would delete Section 502(a)(1)(B) from ERISA where defined benefit plan participants are concerned.

With respect to the future recoupment of benefits, however, Section 502(a)(3) is applicable.  That provision states that "[a] civil action may be brought – by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan." 29 U.S.C. §1132(a)(3).  Defendants do not dispute that Brainard has standing under this section to enjoin further deductions that are part of defendants' scheme to compel him to forfeit $297,364 of a nonforfeitable lump sum pursuant to their unlawful construction of the Plan; neither do defendants claim that such injunctive relief is inappropriate.[10]

---

[9]    For example, in <u>Mertens v. Hewitt Assocs.</u>, 508 U.S. 248 (1993), the plaintiffs did not claim benefits from the plan, but rather sought damages stemming from the plan actuary's misconduct. <u>See</u> <u>Great-West Life & Annuity Ins. v. Knudson</u>, 534 U.S. 204 (2002) (insurance company did not have standing to enforce plan requirement that participant reimburse insurance company for medical costs after the participant obtained those costs from a third party).

[10]    Although the balance defendants claim of $92,000 has not yet been returned to the Plan's trust account, it remains in the possession of the Firm/Administrator.  Those funds are under the latter's unilateral control, as demonstrated by defendants' ability to decide without Brainard's consent to withhold a sum certain going forward from his memorandum accounts, to set a schedule and timing of the recoupment installments, and the amount ($3,994.56) of the semi-monthly recoupment installments.  Brainard therefore has standing to seek such relief under <u>Tenneco</u> and <u>Shinehouse</u>.

III.    THE DISPUTE IS NOT ARBITRABLE

        Defendants argue that both Count I and Count II are arbitrable under the Firm's Partnership Agreement[11] and that the Court should stay the litigation until the arbitration is concluded. (Def. Mem. 13-19)  Neither count is arbitrable and as shown below, as stay would serve only to prejudice Brainard who is in his mid-70's.

    A.    The ERISA Claim Is Not Arbitrable

        As shown above, this dispute arose from the Plan Administrator's decision that, under its interpretation of the "intent of the Plan," Brainard had to refund to the Plan the alleged $297,364 "excess distribution" that he had received from the Plan.  The e-mails of October 3 and 12, 2006 contain no reference to any basis for defendants' actions other than the Joint Plan Committees' belief about what the "intent of the [P]lan" was. (Brainard Decl., Ex. G)  As the Plan does not contain an arbitration clause, Brainard retains the right to litigate the ERISA claim.

        Defendants argue that the dispute regarding Brainard's pension arises under Section 14.d.5 of the Partnership Agreement, which authorizes the Firm to make deductions from distributions from a withdrawing partner's memorandum accounts. (Def. Mem. 14).  Such deductions, however, can be made only for financial obligations "owing by the withdrawing partner to the partnership." (Def. Mem., Ex. B § 14.d.5; emphasis supplied)  The dispute here, as framed by the e-mails of October 2006 and the Complaint, is about a financial obligation Brainard allegedly owes to the Plan, not to the partnership. (See pp. 7-8; supra)  The Partnership Agreement's arbitration provision and Section 14.d.5 therefore do not apply to Brainard's ERISA claim. See AT&T Techs., Inc. v. Commc'ns Workers, 475 U.S. 643, 648 (1986) ("[A] party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.").

---

[11]    Excerpts from the Firm Partnership Agreement are attached as Exhibit B to Def. Mem.

Moreover, in order to compel arbitration, defendants must establish that Brainard was put "on notice" that he was waiving his right to bring his statutory claim in federal court. Cronas v. Willis Group Holdings Ltd., No. 06 Civ. 15295, 2007 WL 2739769, at *10-11 (S.D.N.Y. Sept. 17, 2007); Hoffman v. Aaron Kamhi, Inc., 927 F. Supp. 640, 644 (S.D.N.Y. 1996). Arbitration language that is "poorly worded and ambiguously phrased" cannot support a finding of such a waiver. Id. Nothing in the Partnership Agreement's arbitration clause suggests that it pertains to Brainard's claims against third parties like the Plan.

B.      Count II Is Not Arbitrable

Count II alleges breaches of the Withdrawal Agreement, the two "of counsel" agreements, and the September 1990 Agreement. None of those contracts, however, contains an arbitration clause. Brainard does not allege a breach of the Partnership Agreement.

Of the four agreements at issue, defendants suggest that only one -- the Withdrawal Agreement -- incorporates the Partnership Agreement's arbitration clause and so any dispute under the Withdrawal Agreement must still be arbitrated. (Def. Mem. 14). Defendants appear to contend that the Withdrawal Agreement's mention of the Partnership Agreement and payments pursuant to Section 14 thereof are sufficient to incorporate the Partnership Agreement's arbitration provision. (Def. Mem. 13) Defendants are wrong.

Defendants argue that because the Partnership Agreement arbitration provision may be regarded as "broad," it encompasses all dealings between the parties. (Def. Br. 16-17) Defendants fail to recognize, however, that the Withdrawal Agreement was structured to create a mutual and complete release of past claims regarding Brainard's interest in the Firm (including the memorandum accounts) and related entitlements under the Partnership Agreement. Accordingly, defendants cannot resurrect any right to arbitration that the Partnership Agreement

may have conferred with respect to the Firm's released, unpleaded, and meritless claim that Brainard was not entitled to the full value of his memorandum accounts.

The express intent of the Withdrawal Agreement was that it operate "as a complete settlement of all monies due to [Brainard] under the continuing Firm Agreement and any prior Firm agreements." (Brainard Decl., Ex. A ¶1(a))  To that end, it required that the value of Brainard's interests in the Firm, including the value of his memorandum accounts, be calculated as of September 30, 2003, with a subsequent final statement that would become part of the Withdrawal Agreement. (Id. ¶2(b))  On March 31, 2004, the Firm provided Brainard with that final accounting. (Brainard Decl., Ex. J)  The Withdrawal Agreement does not authorize the Firm to revise that final accounting; to conclude otherwise would nullify the clear and unambiguous intent that the contract constitute a final release or a "complete settlement of all monies due."  Thus, even assuming that the Withdrawal Agreement initially incorporated Section 14.d.5 of the Partnership Agreement and its withholding language,[12] the Withdrawal Agreement did so only until March 31, 2004.

As the Complaint ¶11 alleges, defendants were well aware of the Plan's alleged underfunding at least six months before the final accounting in March 2004. (See Brainard Decl., Ex. E)  The Withdrawal Agreement therefore waived, and cannot be construed to contemplate arbitration of, the Firm's purported basis for recouping part of Brainard's interest under the Partnership Agreement. Cf. Rich v. Salomon Smith Barney, Inc., No. 02 Civ. 3288, 2006 WL 709101, at *3 (S.D.N.Y. Mar. 21, 2006) ("An arbitration panel exceeds its power when it issues an award arising from claims concerning a security which is the subject of a class action settlement, bar order, and releases.")

---

[12]    The defendants cite the procedural language of Section 14.d.5 (Def. Mem. 13-14), but do not allege any substantive breach of the Partnership Agreement to which its withholding language might apply.

Even if the Withdrawal Agreement were ambiguous as to the Firm's entitlement to dispute Brainard's partnership interest, which it is not, that ambiguity precludes the broad construction of the Partnership Agreement arbitration provision that defendants urge: that Brainard and the Firm intended to arbitrate all issues between them in perpetuity. (Def. Mem. 16-17)  Therefore, the test of whether the Withdrawal Agreement incorporates the Partnership Agreement's arbitration clause depends upon whether the Withdrawal Agreement is "collateral" to or "supplements" the Partnership Agreement.  As the Second Circuit has held, "where a later contract lacking an arbitration clause supplements an earlier 'umbrella' agreement containing such a clause, disputes under the later contract are arbitrable." Cornell Univ. v. UAW Local 2300, 942 F.2d 138, 140 (2d Cir. 1991)  On the other hand, if the later contract is a "collateral agreement, arbitration of that dispute cannot be compelled." Prudential Lines, Inc. v. Exxon Corp., 704 F. 2d 59, 64 (2d Cir. 1983).

The Withdrawal Agreement is a collateral agreement because the Partnership Agreement "nowhere references [the Withdrawal Agreement], nor does [the Partnership Agreement] require[] that a [withdrawal agreement] be issued." Fairmont Shipping (H.K.) Ltd. v. Primary Indus. Corp., No. 86 Civ. 3668, 1988 WL 7805, at *4 (S.D.N.Y. Jan. 25, 1988), aff'd, 940 F. 2d 649 (2d Cir. 1991).  Moreover, the Partnership Agreement does not constitute an umbrella agreement because it did not profess to cover all present and future aspects of the relationship between Brainard and the Firm, such as the subsequent "of counsel" arrangement. See Seaboard Coast Line R.R. Co. v. Trailer Train Co., 690 F. 2d 1341, 1349 (11th Cir. 1982). As a result, the Withdrawal Agreement is collateral to the Partnership Agreement, and the latter's arbitration clause does not apply to disputes under the Withdrawal Agreement. See Fairmont Shipping, 1988 WL 7895, at *4; Graphic Commc'ns Int'l Union v. Case-Hoyt Corp., No. 95-CV-1624, 1997 WL 610765, at *3 (N.D.N.Y. Sept. 25, 1997) ("The [grievance] settlement agreement

coordinates with the underlying collective bargaining agreement because it concerns a union employee, but it is separate and distinct because it deals with issues unique to that employee"; thus the collective bargaining arbitration provision was inapplicable to the subsequent settlement contract.).

In short, the Withdrawal Agreement had as its purpose Brainard's withdrawal from the Firm. He was no longer to be a party to the Partnership Agreement and all past obligations from his having been a party thereto were expressly released, including the alleged obligation to arbitrate all subsequent claims.

## IV.    A STAY IS NOT WARRANTED

Under Count I, Brainard seeks remedies against the Plan and the Firm/Administrator that will return to him his full, nonforfeitable benefit. Count II is brought in the alternative in the event he is unable to receive his full benefit from the Plan. Even assuming the dispute under the Withdrawal Agreement is arbitrable, a stay of the ERISA and the three other non-arbitrable contract claims would be inefficient and is otherwise inappropriate.

Defendants have the "burden of establishing that [a stay] is necessary. AIM Int'l Trading, L.L.C. v. Valcucine S.p.A., No. 02 Civ. 1363, 2003 WL 21203503, at *12 (S.D.N.Y. May 22, 2003). Weighing heavily against defendants' motion to stay is the Second Circuit's recognition that, "If some claims are non-arbitrable, while others are arbitrable, then we will sever those claims subject to arbitration from those adjudicable only in court." Collins & Aikman Prods. Co. v. Bldg. Sys., Inc., 58 F.3d 16, 20 (2d Cir. 1995) (Def. Mem. 16-17) The Court rejected as "frivolous" the argument that "federal policy disfavors a bifurcation of proceedings in which some claims are presented to arbitrators and some are decided by a court of law." Id.

The first issue in determining whether a stay is appropriate is whether the arbitrable issues "predominate" over the non-arbitrable ones. AIM Int'l, 2003 WL 21203503, at

*12. As shown above, the ERISA claim and the contract claims involving the September 1990

Agreement and the "of counsel" agreements are non-arbitrable; the sole claim that defendants

even contend is arbitrable does not predominate over the multiple non-arbitrable claims.[13]

Defendants wrongly allege that if Brainard lost on the Withdrawal Agreement

contract claim in arbitration, the ERISA claim would be moot. (Def. Br. 14)  That argument fails

to recognize the additional requirements such as nonforfeitability that ERISA imposes on the

Plan and its fiduciaries who are not parties to any arbitration. (Complaint ¶22)  Those ERISA

requirements are not necessarily applicable in a contract proceeding.

As the Second Circuit recognized in finding error in the trial court's stay of

proceedings pending arbitration, a "difference between the parties and issues in the court action

and in the arbitration undermines the rationale that the arbitration will have an effect on the

stayed action." Sierra Rutile Ltd. v. Katz, 937 F.2d 743, 750 (2d Cir. 1991).[14]  Thus, the

possibility of litigating an ERISA claim after an arbitration ruling would unfairly delay

resolution and present "undue hardship" for Brainard, because of the additional expense and

because of his age.[15]  Moreover, contrary to defendants' contention (Def. Mem. 18), as the

---

[13]    This case thus is distinguishable from Genesco, Inc. v. T. Kakiuchi & Co., 815 F.2d 840, 856 (2d Cir. 1987) (Def. Mem. 18) in which the Second Circuit remanded a case for consideration of a stay where seven of ten claims were arbitrable in whole or in part.

[14]    See Dean Witter Reynolds, Inc. v. Byrd, 470 U.S. 213, 222 (1985) (noting that "it is far from certain that arbitration proceedings will have any preclusive effect on the litigation of nonarbitrable federal claims"); American Shipping Line, Inc. v. Massan Shipping Indus., Inc., 885 F. Supp. 499, 502 (S.D.N.Y. 1995) (denying stay, in part because "it is never possible to determine the preclusive effects of a given arbitration on a proceeding until after the arbitration has ended.")

[15]    In contrast, in WorldCrisa Corp. v. Armstrong, 129 F.3d 71, 76 (2d Cir. 1997), cited by defendants (Def. Mem. 17), the Court found that the "prejudice to [the plaintiff's parent company] if a stay is granted is minimal."

ERISA claim will be resolved largely on the basis of documents and undisputed facts, an arbitration record would provide scant insight into the issues of fact and law involved.

If the defendants had in good faith believed that their dispute with Brainard fell under the Partnership Agreement, they would have commenced arbitration proceedings back in March 2006, before resorting to self-help and seizing monies from him without his consent. Common decency would have dictated that they extend such an accommodation to their partner of 38 years. The arbitration they now strain to compel would have been over by now. In these circumstances, the Court can readily conclude that defendants "hamper[ed]" the arbitration from taking place, another ground for denying a stay. Citrus Marketing Board of Israel v. J. Lauritzen A/S, 943 F. 2d 220, 225 (2d Cir. 1991).

## CONCLUSION

For the reasons set forth above, defendants' motion should be denied in its entity.

Dated:     New York, New York
           January 16, 2008


                              VLADECK, WALDMAN, ELIAS &
                              ENGELHARD, P.C.


                    By:    _____
                           Debra L. Raskin (DR-5431)
                           James Wasserman (JW-3717)
                           Attorneys for Plaintiff
                           1501 Broadway, Suite 800
                           New York, New York  10036
                           (212) 403-7300